Filed 12/24/25 (Prior opinion filed 12/23/25 vacated)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| ROBERT LACOUR, <br>     Plaintiff and Respondent, <br> v. <br> MARSHALLS OF CA, LLC, et al., <br>     Defendants and Appellants. | A170191 <br><br> (Alameda County <br> Super. Ct. No. RG21084368) |


Marshalls of California, LLC, Marshalls of Massachusetts, Inc., and The TJX Companies, Inc. (collectively Marshalls) appeal from the denial of their motion to compel arbitration of a single-count complaint filed against them by a former employee, Robert LaCour (LaCour), under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.).  We will affirm.

## I. BACKGROUND

LaCour was employed by Marshalls for some years as a Loss Specialist.  In March 2014, he signed an arbitration agreement (the Arbitration Agreement or the Agreement).  Among the provisions in the Arbitration Agreement is paragraph 5, a "Class Action, Collective Action, and Private Attorney General Waiver," which states in pertinent part: "[LaCour and Marshalls] agree to bring any dispute in arbitration on an individual basis only and not on a class, collective, or private attorney

1

general representative action basis. [¶] . . . [¶] (c) There will be no right or authority for any dispute to be brought, heard or arbitrated as a private attorney general representative action ('[PAGA Waiver]'). The [PAGA Waiver] shall be severable from this Agreement in any case in which a civil court of competent jurisdiction finds the [PAGA Waiver] is invalid, unenforceable, revocable, unconscionable, void or voidable. In such instances and where the claim is brought as a private attorney general claim, such private attorney general claim must be litigated in a civil court of competent jurisdiction." A concluding proviso to this provision, set off as an additional subparagraph applicable to the entire paragraph and all subparagraphs, states, "The . . . [PAGA Waiver] shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration."[1]

Following LaCour's termination from employment with Marshalls, he brought suit on behalf of himself, other employees and former employees, and the State of California, alleging a single cause of action for violation of PAGA. Grounding his PAGA action on various alleged violations of various wage-and-hour provisions in the Labor Code, LaCour sought to recover a range of civil penalties for each violation. The complaint pleads all alleged violations of the Labor Code and all requested relief in the aggregate. Throughout the complaint, it alleges that "[p]laintiff and the aggrieved employees" suffered violations of the Labor Code. The complaint does not seek separate recovery of penalties attributable to Labor Code violations

---

[1] Subparagraph (c) is preceded by subparagraphs (a) and (b), which are, respectively, identically worded class action and collective action waivers. The concluding proviso applies to all three lettered subparagraphs.

suffered by LaCour personally, as distinct from violations suffered by others similarly situated.

Marshalls moved to compel arbitration, invoking *Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639 [142 S.Ct. 1906] (*Viking River*). According to Marshalls, the rule in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348 (*Iskanian*) that invalidates wholesale waivers of PAGA claims in any forum is preempted by the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.) to the extent such a waiver bars agreed arbitration of the "individual component" of LaCour's PAGA claim. In Marshalls' view, just as the severance clause in the arbitration agreement at issue in *Viking River* required arbitration of the "individual PAGA claim" in that case notwithstanding *Iskanian*, so the severance clause in the Arbitration Agreement here requires compelled arbitration of LaCour's "individual PAGA claim" in this case. The court denied the motion, commenting that "[i]n light of the law that every claim asserted under the PAGA is a claim asserted by the plaintiff as a proxy or agent of the state, there is no such thing as an 'individual PAGA claim.' "

## II. LEGAL LANDSCAPE

### A.

PAGA was enacted "to augment the limited enforcement capability of the [Labor and Workforce Development Agency (LWDA)] by empowering employees to enforce the Labor Code as representatives of the [LWDA]." (*Iskanian*, *supra*, 59 Cal.4th at p. 383.)

The PAGA statute " 'deputizes an "aggrieved" employee to bring a lawsuit "on behalf of himself or herself and other current or former employees" to recover civil penalties for Labor Code violations that would otherwise be assessed and collected by the state. [Citations.] . . . Although an aggrieved employee is the named plaintiff in a PAGA action, an employee

suing under PAGA " 'does so as the proxy or agent of the state's labor law enforcement agencies.' " [Citation.] Thus, "[e]very PAGA claim is 'a dispute between an employer and the state.' " ' " (*DeMarinis v. Heritage Bank of Commerce* (2023) 98 Cal.App.5th 776, 783 (*DeMarinis*).)

An "arbitration agreement requiring an employee as a condition of employment to give up the right to bring representative PAGA actions *in any forum* is contrary to public policy" because such an agreement seeks to exempt employers from responsibility for their legal violations and violates the statutory rule that " ' "a law established for a public reason cannot be contravened by a private agreement." ' " (*Iskanian*, *supra*, 59 Cal.4th at pp. 360, 383, italics added; see Civ. Code, § 3513.)

The employer in *Iskanian* tried to draw a distinction between "representative claims" and "individual claims," arguing that its PAGA waiver only prohibited the latter. Without deciding one way or another whether there is such a thing as an individual PAGA claim, the court held that, assuming it is authorized, "a prohibition of *representative* claims frustrates the PAGA's objectives." (*Iskanian*, *supra*, 59 Cal.4th at p. 384, original italics.) To allow a "a single-claimant" PAGA arbitration would subvert the PAGA scheme by neutering the deterrent impact PAGA claims are designed to have. (*Iskanian*, at p. 384.)

*Iskanian* further held its rule was not preempted by the FAA. A PAGA action lies outside the FAA's coverage entirely, the *Iskanian* court held, because section 2 of the FAA is limited to controversies "arising out of" the contract between the parties and a PAGA action is not a private dispute, but "a dispute between an employer and the *state* [LWDA]." (*Iskanian*, *supra*, 59 Cal.4th at pp. 385, 386, original italics.) As such, a prohibition against PAGA waivers "does not interfere with the FAA's goal of promoting

4

arbitration as a forum for private dispute resolution." (*Iskanian*, at pp. 388–389.)

In light of *Iskanian*, "various courts held that employers may not require employees to 'split' PAGA actions in a manner that puts individual and non-individual components of a PAGA claim into bifurcated proceedings" between arbitral and judicial forums. (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1118 (*Adolph*), citing *Perez v. U-Haul Co. of California* (2016) 3 Cal.App.5th 408, 420–421 and *Williams v. Superior Court* (2015) 237 Cal.App.4th 642, 649 (*Williams I*); see *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 87 (*Kim*) ["There is no individual component to a PAGA action because ' "*every* PAGA action . . . is a representative action on behalf of the state." ' "].)

**B.**

The United States Supreme Court entered the picture in *Viking River*, *supra*, 596 U.S. 639, partially abrogating *Iskanian* but leaving it largely intact. There, in an opinion authored by Justice Alito, the high court held the FAA preempts the holding in *Iskanian* "insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate." (*Viking River*, at p. 662.) The *Viking River* opinion is complex and nuanced, and to be properly understood, its reasoning must be examined in detail. Because of the centrality of *Viking River* to the arguments made by the parties in this case, we pause to review the case, section by section.

**1.**

In Part I.A of its opinion (*Viking River, supra,* 596 U.S. at pp. 643–647),[2] the high court began with a general description of the PAGA statutory scheme. Citing *Iskanian, supra,* 59 Cal.4th 348 and *Arias v. Superior Court* (2009) 46 Cal.4th 969, the high court stated, "California law characterizes PAGA as creating a 'type of *qui tam* action' " (*Viking River,* at p. 645) under which aggrieved employees who have suffered Labor Code violations may bring a " ' "representative action" ' " as an " ' "agent or proxy" ' of the State." (*Viking River,* at p. 645.) This scheme, the high court stated, "gives employees a right to assert the State's claims for civil penalties on a representative basis, but it does not create any private rights or private claims for relief." (*Id.* at p. 646.)

The high court then stated that "California precedent also interprets the statute to contain what is effectively a rule of claim joinder," allowing "a party to unite multiple claims against an opposing party in a single action." (*Viking River, supra,* 569 U.S. at p. 646.) Here, the high court cited no California authority. It relied on principles of claim joinder as described in a federal practice treatise.[3] Citing *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175—a PAGA standing case—it segued to the observation that "PAGA standing has the same function" as claim joinder because "[a]n employee with statutory standing may 'seek any civil penalties the state can, including penalties for violations involving employees other than the PAGA litigant herself.' " (*Viking River,* at pp. 646–647.)

---

[2] All subsequent references to Part I, Part II, Part III, Part IV, or any of their subparts, refer to the majority opinion in *Viking River*.

[3] *Viking River, supra,* 569 U.S. at page 646, citing 6A Wright, Miller, and Cooper, Federal Practice and Procedure (3d ed. 2016) section 1582.

In Part I.B of its opinion (*Viking River*, *supra*, 596 U.S. at pp. 647–649), the high court moved to a discussion of the arbitration agreement between the parties before it, Viking River Cruises and Angie Moriana. "The [arbitration] agreement contained a 'Class Action Waiver' providing that in any arbitral proceeding, the parties could not bring any dispute as a class, collective, or representative PAGA action. It also contained a severability clause specifying that if the waiver was found invalid, any class, collective, representative, or PAGA action would presumptively be litigated in court. But under that severability clause, if any 'portion' of the waiver remained valid, it would be 'enforced in arbitration.' " (*Viking River*, at p. 647.)

Against this contractual backdrop, the high court read *Iskanian* as having announced two rules, a "principal rule" (the public policy invalidation of PAGA waivers) and a "secondary rule" (the bar against splitting of PAGA claims into arbitrable individual claims and non-arbitrable representative claims). (*Viking River*, *supra*, 596 U.S. at pp. 647, 649.) Prefacing its discussion of *Iskanian* were some comments about how the term "representative" is unclear in California PAGA law, which it suggested is still in a nascent state. (*Viking River*, at pp. 648–649.)[4] The high court observed that "PAGA's unique features have prompted the development of an entire vocabulary unique to the statute," and then said "[a]n unfortunate feature of this lexicon is that it tends to use the word

---

[4] See *Viking River*, *supra*, 596 U.S. at page 648 ("the details, it seems, are still being worked out"); *id*. at page 654, footnote 6 (noting that court's use of the term "single representative PAGA claim" in *Williams I, supra,* 237 Cal.App.4th at p. 649, is a "manner of speaking [that] is another reflection of the still-embryonic character of the language that has grown up around PAGA").

7

'representative' in two distinct ways" (*id.* at p. 648), first to denote the aspect of the PAGA regime in which employee plaintiffs act as agents of the state, and second to denote the ability of these plaintiffs to collect penalties for Labor Code violations suffered by others (*Viking River,* at pp. 648–649).

"In the first sense," the high court explained, " ' "*every* PAGA action is . . . representative," ' " which is why it is often said that " '[t]here is no individual component to a PAGA action.' " (*Viking River*, *supra*, 596 U.S. at p. 648, quoting *Kim*, *supra*, 9 Cal.5th at p. 87.)  But since PAGA is also "representative" in the sense that it effectively allows aggregation of many claims, the high court said, "it makes sense to distinguish 'individual' PAGA claims, which are premised on Labor Code violations actually sustained by the plaintiff, from 'representative' (or perhaps quasi-representative) PAGA claims arising out of events involving other employees." (*Viking River*, at pp. 648–649.)  The high court then adopted its own terminology "[f]or purposes of this opinion"—and hence as a matter of federal law, since this analytical step is the predicate for the preemption analysis to follow— stating that, in its reading of the PAGA scheme, the term " 'individual PAGA claim' refer[s] to claims based on code violations suffered by the plaintiff." (*Viking River*, at p. 649.)

**2.**

Having defined the term "individual PAGA claim" for purposes of federal preemption analysis in Part II (*Viking River*, *supra*, 596 U.S. at pp. 649–659), the high court turned to a discussion of the parties' preemption arguments.

Viking River Cruises, the employer, framed its analysis under *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662 [130 S.Ct. 1758]

8

(*Stolt-Nielsen*),[5] *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 333 [131 S.Ct. 1740] (*AT&T Mobility*),[6] and *Epic Systems Corp. v. Lewis* (2018) 584 U.S. 497 [138 S.Ct. 1612] (*Epic Systems*),[7] a line of cases that, in its view, stands for the proposition that " 'a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so.' " (*Viking River*, *supra*, 596 U.S. at p. 651, original italics; *id*. at pp. 650–652.) It argued that *Iskanian*'s "prohibition on PAGA waivers presents parties with the same impermissible choice as the rules . . . invalidated in [these] decisions concerning class- and collective-action waivers: Either arbitrate disputes using a form of class procedure, or do not arbitrate at all." (*Viking River*, at p. 652.)

Angie Moriana, the employee, countered that PAGA simply creates a substantive cause of action, not a set of procedures for handling multiple claims for multiple claimants. (*Viking River*, *supra*, 596 U.S. at p. 652.) That assertion is consistent with California cases rejecting the idea that

---

[5] *Stolt-Nielson* held that, absent express consent allowing it, arbitration of a class action claim is incompatible with "the consensual nature of private dispute resolution" and thus violates "the basic precept that arbitration 'is a matter of consent, not coercion.' " (*Stolt-Nielsen, supra,* 559 U.S. at pp. 683, 681.)

[6] *AT&T Mobility* abrogated on federal preemption grounds the holding in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 that a class action waiver in a consumer arbitration agreement was unenforceable as a contract of adhesion.

[7] *Epic Systems* reversed lower court decisions holding that a " 'saving clause' " in the FAA (see 9 U.S.C. § 2), together with a provision of the National Labor Relations Act allowing employees to engage in " 'concerted activit[y]' " (see 29 U.S.C. § 157), authorized class actions under the Fair Labor Standards Act and overrode employee agreements to engage in individualized arbitration. (*Epic Systems*, *supra*, 584 U.S. at pp. 503–505, 525.)

PAGA claims are analogous to class actions and require the full panoply of due process-driven procedural protections that class actions bring with them. (See *Williams v. Superior Court* (2017) 3 Cal.5th 531, 544–549 (*Williams II*).) To the extent multiple Labor Code violations are implicated in PAGA actions, Moriana argued, they are simply "predicates for expanded liability under a single cause of action." (*Viking River*, at p. 652.)[8]

The high court accepted neither characterization of PAGA and found neither party's position fully persuasive. (*Viking River*, *supra*, 596 U.S. at p. 653.) It rejected "Moriana's premise that PAGA creates a unitary private cause of action." (*Ibid*.) That idea, the high court held, "is irreconcilable with the structure of the statute and the ordinary legal meaning of the word 'claim.' " (*Ibid*.) Consistent with its background recitation of how the PAGA statutory scheme works—and its analogy equating PAGA's conception of standing to a claim joinder rule—the high court stated that "a PAGA action asserting multiple code violations affecting a range of different employees does not constitute 'a single claim' in even the broadest possible sense,

---

[8] In a footnote, the high court observed that Moriana "decline[d] to defend" *Iskanian*'s broad holding that, because "a PAGA action 'is . . . a dispute between an employer and the [LWDA],' " it is not a "private" dispute subject to federal preemption analysis under section 2 of the FAA. (*Viking River*, *supra*, 569 U.S. at p. 652, fn. 4, citing *Iskanian*, *supra*, 59 Cal.4th at p. 387.) The high court rejected *Iskanian*'s rationale addressing this point—a rationale that had been followed in many other cases (see *Correia v. NB Baker Electric, Inc.* (2019) 32 Cal.App.5th 602, 621–622 [citing and discussing cases])—and instead held that (1) the employment relationship between Viking River Cruises and Moriana is causally enough related to the PAGA dispute between the LWDA and Viking River Cruises to satisfy the " 'arising out of' language" in section 2, and (2) in any event, "nothing in the FAA categorically exempts claims belonging to sovereigns from the scope of § 2." (*Viking River*, at p. 652, fn. 4.)

10

because the violations asserted need not even arise from a common 'transaction' or 'nucleus of operative facts.' " (*Viking River*, at p. 654.)[9]

But the high court disagreed with Viking River Cruises, too, pointing out that its position "elides important structural differences between PAGA actions and class actions." (*Viking River*, *supra*, 596 U.S. at p. 654.) Viking River Cruises tried to invoke the Congressionally sanctioned policy in the FAA promising a "quicker, more informal, and often cheaper" mode of dispute resolution than courts can offer (*Epic Systems*, *supra*, 584 U.S. at p. 505), arguing that PAGA actions are incompatible with the prototypical model of an arbitration as an "individualized and informal" proceeding. (*Viking River*, at p. 656.) Ultimately, however, the high court declined to accept the class action analogy.

The high court explained: "PAGA actions," like class actions, "permit the adjudication of multiple claims in a single suit, but their structure is entirely different. A class-action plaintiff can raise a multitude of claims because he or she represents a multitude of absent individuals; a PAGA plaintiff, by contrast, represents a single principal, the LWDA, that has a multitude of claims." (*Viking River*, *supra*, 596 U.S. at p. 655.) As a result of this structural difference, PAGA suits do not "present the problems of notice, due process, and adequacy of representation that render class arbitration inconsistent with arbitration's traditionally individualized form." (*Viking River*, at p. 655.) "If there is a conflict between California's

---

[9] The high court again relies on federal procedural law, citing *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.* (2020) 590 U.S. 405 [140 S.Ct. 1589]. *Lucky Brand*, a trademark case, applies the claim preclusion branch of the federal common law of res judicata, which in turn follows the "common nucleus of operative facts" test set forth in section 24 of the Restatement Second of Judgments for defining the scope of a "claim."

11

prohibition on PAGA waivers and the FAA," the high court concluded, "it must derive from a different source." (*Id.* at p. 659.)

**3.**

The core of the *Viking River* preemption analysis, a middle ground argued by neither party, is set forth in Part III of its opinion (*Viking River, supra*, 596 U.S. at pp. 659–662). Returning to the idea that PAGA's broad rule of standing may be equated with a rule of mandatory claim joinder, Part III opened with the observation, "We think that . . . a conflict between PAGA's procedural structure and the FAA does exist, and that it derives from the statute's built-in mechanism of claim joinder." (*Viking River*, at p. 659.) That narrowed the high court's focus to what it previously termed *Iskanian*'s "secondary rule," prohibiting splitting out a PAGA action into an arbitrable "individual PAGA claim" from the remainder of the "claims" comprising the action.

"This prohibition on contractual division of PAGA actions into constituent claims," the high court pointed out, "unduly circumscribes the freedom of parties to determine 'the issues subject to arbitration' and 'the rules by which they will arbitrate.' " (*Viking River, supra*, 596 U.S. at p. 659, quoting *Lamps Plus, Inc. v. Varela* (2019) 587 U.S. 176, 184 [139 S.Ct 1407] (*Lamps Plus*).) While modern rules of claim joinder effectively force parties in many circumstances to bundle "claims" together, "the FAA licenses contracting parties to depart from standard rules 'in favor of individualized arbitration procedures of their own design,' so parties to an arbitration agreement are not required to follow the same approach. [Citation.] And that is true even if bifurcated proceedings are an inevitable result." (*Viking River*, at p. 660.)

Citing *Lamps Plus*, *supra*, 587 U.S. at p. 176, and *Stolt-Nielsen*, *supra*, 559 U.S. at p. 684, the court explained: "A state rule imposing an expansive rule of joinder in the arbitral context would defeat the ability of parties to control which claims are subject to arbitration. Such a rule would permit parties to superadd new claims to the proceeding, regardless of whether the agreement between them committed those claims to arbitration. Requiring arbitration procedures to include a joinder rule of that kind compels parties to either go along with an arbitration in which the range of issues under consideration is determined by coercion rather than consent, or else forgo arbitration altogether. Either way, the parties are coerced into giving up a right they enjoy under the FAA." (*Viking River*, *supra*, 596 U.S. at pp. 660–661.)

Contrary to the FAA-sanctioned policy favoring consensual arbitration, *Iskanian*'s anti-splitting rule interferes with the parties' ex ante freedom to decide how they wish to resolve future disputes, the high court explained. Faced with the bar on splitting of PAGA actions, the "parties cannot agree to restrict the scope of an arbitration to disputes arising out of a particular ' " 'transaction' " ' or ' "common nucleus of facts." ' [Citation.] If the parties agree to arbitrate 'individual' PAGA claims based on personally sustained violations, *Iskanian* allows the aggrieved employee to abrogate that agreement after the fact and demand either judicial proceedings or an arbitral proceeding that exceeds the scope jointly intended by the parties." (*Viking River*, *supra*, 596 U.S. at p. 661.) That was the heart of the high court's preemption rationale.

Part III then concluded: PAGA's "combination of standing to act on behalf of a sovereign and mandatory freeform joinder allows plaintiffs to unite a massive number of claims in a single-package suit. But as we have

13

said, '[a]rbitration is poorly suited to the higher stakes' of massive-scale disputes of this kind. [Citation.] . . . As a result, *Iskanian*'s indivisibility rule effectively coerces parties to opt for a judicial forum rather than 'forgo[ing] the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution.' [Citations.] This result," said the high court, is "incompatible with the FAA." (*Viking River*, *supra*, 596 U.S. at pp. 661–662.)

**4.**

A wrap-up section of the *Viking River* opinion, Part IV (*Viking River*, *supra*, 596 U.S. at pp. 662–663), summarized the high court's preemption analysis and bottom-line disposition of the case—a reversal partially abrogating the anti-splitting rule laid down in *Iskanian*, but which leaves intact *Iskanian*'s "principal rule" invalidating any "wholesale waiver" of PAGA claims.

Here, the high court introduced for the first time the phrase "non-individual claim."[10] Employing that phrase together with and in contradistinction to the previously defined phrase "individual PAGA claim," it stated, "We hold that the FAA preempts the rule of *Iskanian* insofar as it precludes division of PAGA actions into individual and non-individual claims through an agreement to arbitrate. . . . The agreement between Viking and Moriana purported to waive 'representative' PAGA claims.

---

[10] Given the care the high court took in Part II.B. to define the phrase "individual PAGA claim" and avoid using statutory terminology (i.e., "representative") which it found to be problematic, we understand the phrase "non-individual PAGA claim"—unrecognized and unused in PAGA law prior to *Viking River*—to mean whatever portion of a PAGA claim remains in a scenario where, under a predispute arbitration agreement, the parties have contractually agreed to arbitrate any "individual claim" premised on a violation of the Labor Code.

14

Under *Iskanian*, this provision was invalid if construed as a wholesale waiver of PAGA claims. And under our holding," the court concluded, "that aspect of *Iskanian* is not preempted by the FAA, so the agreement remains invalid insofar as it is interpreted in that manner." (*Viking River*, *supra*, 596 U.S. at p. 662.)

But there was a twist. Because the PAGA waiver in the case contained a severability clause, the parties' arbitration agreement remained partially enforceable. That is what drove the reversal. The high court explained, "[T]he severability clause in the [arbitration] agreement provides that if the waiver provision is invalid in some respect, any 'portion' of the waiver that remains valid must still be 'enforced in arbitration.' Based on this clause, Viking was entitled to enforce the agreement insofar as it mandated arbitration of Moriana's individual PAGA claim. The lower courts refused to do so based on the rule that PAGA actions cannot be divided into individual and non-individual claims. Under our holding," the court explained, "that rule is preempted, so Viking is entitled to compel arbitration of Moriana's individual claim." (*Viking River*, *supra*, 596 U.S. at p. 662.)

After summarizing its holding in this fashion, the high court added a penultimate paragraph addressing one "remaining question": "[W]hat [should] the lower courts . . . have done with Moriana's non-individual claims[?]" (*Viking River*, *supra*, 596 U.S. at p. 662.) "[A]s we see it," the opinion stated in answer to this state law question, "PAGA provides no mechanism to enable a court to adjudicate nonindividual PAGA claims once an individual claim has been committed to a separate proceeding. Under PAGA's standing requirement, a plaintiff can maintain non-individual PAGA claims in an action only by virtue of also maintaining an individual

15

claim in that action." (*Id.* at p. 663, citing Lab. Code, § 2699, subds. (a), (c).) Thus, "[w]hen an employee's own dispute is pared away from a PAGA action, the employee is no different from a member of the general public, and PAGA does not allow such persons to maintain suit. [Citation.] As a result, [the plaintiff] lacks statutory standing to continue to maintain her non-individual claims in court, and the correct course is to dismiss her remaining claims." (*Viking River*, at p. 663.)

## C.

The *Viking River* majority opinion must be read in light of the separate writings in the case. There are three separate opinions. (*Viking River*, *supra*, 596 U.S. at pp. 663–665.) Justice Thomas dissented based on his longstanding view that the FAA does not apply to state court proceedings. (*Viking River*, *supra*, at p. 665 (dis. opn. of Thomas, J.).) Justice Barrett, joined by Chief Justice Roberts and Justice Kavanaugh, concurred in part and concurred in the judgment; her separate concurrence joined only in Part III, and explained that she saw Parts II and IV as "unnecessary to the result." (*Id.* at p. 664 (conc. opn. of Barrett, J.).)[11] Justice Sotomayor joined in full but also concurred separately; she stated her view that *Viking River*'s standing analysis was "based on available guidance from California courts," and that "if this Court's understanding of state law is wrong, California courts, in an appropriate case, will have the last word." (*Id.* at p. 664 (conc. opn. of Sotomayor, J.).) Because Justice

---

[11] Justice Barrett did not explain why she viewed these sections of the opinion as unnecessary to the result. But we observe that both Part II and Part IV contain opinion and commentary on California PAGA law. She and Justice Kavanaugh, but not Chief Justice Roberts, also saw Part I as unnecessary to the result. (*Viking River*, *supra*, 596 U.S. at p. 664 & fn. * (conc. opn. of Barrett, J.).)

Sotomayor supplied the fifth vote for the five-justice majority, the caveat she laid down—deferring to the California courts on the "remaining question" at the end of the opinion—left it to the California courts to decide that question.

The last word on the PAGA standing question raised in Part IV came in 2023 when the California Supreme Court held in *Adolph*, *supra*, 14 Cal.5th 1104, that an aggrieved employee who was compelled to arbitrate his individual PAGA claim nonetheless maintained standing to pursue his nonindividual PAGA claims in court.  (*Adolph*, at p. 1114.)  The court prefaced its analysis with the statement that it was "us[ing] the terms 'individual' and 'non-individual' claims in accordance with the high court's usage in *Viking River*[,]" and then held that "[w]here a plaintiff has brought a PAGA action comprising individual and non-individual claims, an order compelling arbitration of the individual claims does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA."  (*Ibid*.)

A plaintiff obtains standing as an " 'aggrieved employee' " for PAGA purposes "upon sustaining a Labor Code violation committed by his or her employer[,]" the *Adolph* court held.  (*Adolph*, *supra*, 14 Cal.5th at p. 1121.)  And where the "aggrieved employee" standard is met, PAGA standing "is not affected by enforcement of an agreement to adjudicate a plaintiff's individual claim in another forum," as this "does not nullify the fact of the violation or extinguish the plaintiff's status as an aggrieved employee." (*Adolph,* at p. 1121.)  In so concluding, the court emphasized it was not bound by *Viking River*'s interpretation of California law.  (*Id*. at p. 1119.)  Although the court did not say so directly, the import of its holding confirmed, as Justice Sotomayor apparently suspected might be the case,

17

that *Viking River*'s interpretation of PAGA standing law was indeed "wrong." (*Viking River*, *supra*, 596 U.S. at p. 664 (conc. opn. of Sotomayor, J.).)

## III. ANALYSIS

Marshalls argues that the plain language of the Arbitration Agreement covers LaCour's claims as a "dispute" "arising out of or relat[ing] to" his employment, and under the opening sentence of Paragraph 5 of the Agreement (Paragraph 5), LaCour agreed to "bring any dispute in arbitration on an individual basis only, and not on a class, collective, or private attorney general representative action basis." According to Marshalls, not only did LaCour bring an individual PAGA claim in this case (he sued both for himself as an individual and for similarly aggrieved Marshalls employees), but under Labor Code section 2699, subdivision (a) as construed in *Leeper v. Shipt, Inc.* (2024) 107 Cal.App.5th 1001 (*Leeper*), review granted April 16, 2025, S289305, every PAGA claim necessarily includes an individual component.[12] Thus, Marshalls argues, arbitration of

[12] *Leeper*, decided in late 2024, addresses arbitrability in the context of a so-called "headless" PAGA action, a type of case that some PAGA plaintiffs have begun to file to avoid the arbitrability of "individual PAGA claims" under *Viking River*. In these suits, the plaintiff employee or former employee deliberately refrains from seeking recovery of penalties for Labor Code violations on his or her own behalf and seeks recovery of penalties only on behalf of other similarly situated aggrieved employees. Rejecting the argument that there is no such thing as an individual PAGA claim in such a suit on the textual ground that, under Labor Code section 2699, subdivision (a), all PAGA actions must include an individual claim, the court reversed a trial court order denying a motion to compel arbitration of the individual component of a "headless" PAGA action and ordered a stay of the remaining representative portion of the claim. (*Leeper*, *supra*, 107 Cal.App.5th at pp. 1008–1012.) The California Supreme Court granted review in *Leeper* on April 16, 2025, S289305. Since the Court of Appeal opinion in *Leeper* was

LaCour's individual PAGA claim is mandatory under *Viking River*. The error is evident, Marshalls contends, by the trial court's statement, directly contrary to *Viking River*, that "there is no such thing as an 'individual PAGA claim.' "

LaCour, too, invokes what he contends is the plain language of the Arbitration Agreement. He views Paragraph 5(c) of the Agreement as an unequivocal waiver of his right to bring a PAGA claim in any forum, and, pointing out that the rule in *Iskanian* invalidating such waivers on public policy grounds retains its vitality, as *Viking River* recognized and as *Adolph* reaffirms, he argues the trial court was right to deny Marshalls' motion to compel arbitration. He backs away from the trial court's broad statement that under California law there is "no such thing" as an individual PAGA claim, but states that, in denying Marshalls' petition to compel arbitration, the court was "on solid ground" regardless because the parties never agreed to arbitrate individual PAGA claims. Without mentioning *Leeper*——which is a focal point of Marshalls' analysis—he contends the dispositive issue here is whether, in this case, under the governing contract language, LaCour and Marshalls agreed to arbitrate individual PAGA claims.

According to LaCour, there was no such agreement. He points to the severability clause in Paragraph 5(c) of the Arbitration Agreement, which provides that, in the event the PAGA Waiver is held to be invalid, then any PAGA action must be brought in court, not arbitrated. He relies heavily on

---

filed, there have been two published opinions disagreeing with it. (See *Rodriguez v. Packers Sanitation Services LTD., LLC* (2025) 109 Cal.App.5th 69, review granted, May 14, 2025, S290182 [action deferred pending consideration and disposition of related issues in *Leeper* or further order of the court]; *CRST Expedited, Inc. v. Superior Court* (2025) 112 Cal.App.5th 872, review granted, Sept. 17, 2025, S292005 [same].)

*DeMarinis, supra,* 98 Cal.App.5th 776, where compelled arbitration of a PAGA action was denied because, under a "poison pill" clause that invalidated the entire arbitration agreement at issue should any of its provisions be declared null and void, it was clear the parties did not intend to arbitrate anything following invalidation of a PAGA waiver. According to LaCour, the severability clause here, while narrower than the "poison pill" clause in *DeMarinis*, has the same legal consequence since it, too, affirmatively shows the parties did not agree to arbitrate PAGA actions in the event of an *Iskanian* invalidation.

In reply, Marshalls takes LaCour to task for reading the severability language in Paragraph 5(c) in isolation. Focusing on the proviso at the end of Paragraph 5 ("[t]he . . . [PAGA Waiver] shall be severable in any case in which the dispute is filed as an individual action and severance is necessary to ensure that the individual action proceeds in arbitration"), Marshalls urges us to read the severability language in Paragraph 5(c) together with the concluding proviso and the opening sentence of Paragraph 5. When all the relevant language is read as a whole, Marshalls argues, it is evident the parties intended that, upon any invalidation of the PAGA Waiver, representative PAGA claims were to be brought in court, while all individual claims were to be arbitrated. In effect, Marshalls argues, the language of the Arbitration Agreement anticipated exactly the result reached in *Viking River*—a splitting of PAGA claims into individual and non-individual pieces, which the parties were free to do and the FAA compels us to respect. On that reading, contends Marshalls, because the severability clause in Paragraph 5 is "substantively indistinguishable" to the severability clause in *Viking River*, arbitration of LaCour's individual PAGA claim is mandatory. *Demarinis*, Marshalls claims, is not only

20

distinguishable (its "poison pill" language was a *non*-severability clause, not a severability clause), but should not be followed in the face of *Viking River* as superior authority.

We conclude that LaCour has the better of the argument, and we arrive at that conclusion based on the contract language alone. We see no need to address the parties' contending positions concerning *Leeper*, *DeMarinis*, or any of the other post-*Viking River* cases they cite.

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties at the time of contract formation. (Civ. Code, § 1636.) 'We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which the contract was made and the matter to which it relates. [Citations.] We consider the contract as a whole and interpret the language in context, rather than interpret a provision in isolation. [Citation.] We interpret words in accordance with their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. [Citation.] If contractual language is clear and explicit and does not involve an absurdity, the plain meaning governs.' " (*Ford v. The Silver F, Inc.* (2025) 110 Cal.App.5th 553, 565–566.) "When interpreting the provisions in an arbitration agreement covered by the FAA, due regard must be given to the federal policy favoring arbitration and, as a result, ambiguities as to the scope of the arbitration clause should be resolved in favor of arbitration. [Citations.] [¶] At the same time, arbitration is a matter of consent, not coercion [citation], and ' "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" ' [citation]. '[W]e do not override the clear intent of the parties, or reach a result inconsistent with

21

the plain text of the contract, simply because the policy favoring arbitration is implicated.' " (*Ford*, at p. 566.)

As of January 2014, the temporal benchmark we must use in ascertaining the parties' mutual intent, the distinction *Viking River* drew between "individual PAGA claims" and "non-individual PAGA claims" was, if not unknown to California law, dimly perceived at best.[13]  Under those circumstances, if the contract language was intended to mean what Marshalls now claims it means, we would have expected more clarity. Specifically, the words in Paragraph 5(c) would have read, "[i]n such instances, and where the claim is brought as a *non-individual* private attorney general claim, such private attorney general claim must be litigated in a civil court of competent jurisdiction"; and the Paragraph 5 proviso to have read, ". . . severance is necessary to ensure that the individual *PAGA* action proceeds in arbitration."  (Italics added.)  But as drafted, the descriptive terms "non-individual" and "PAGA" are omitted.

It makes sense why no one at the time had the foresight to use such specific language, since, until after *Viking River* was decided, no California court had ever intimated there are two constituent pieces to a PAGA

---

[13] We have been able to find a single pre-2014 case, a federal district court opinion, *Quevedo v. Macy's, Inc.* (C.D. Cal. 2011) 798 F.Supp.2d 1122, holding that the individual component of a PAGA action must be sent to arbitration, while what remains of the action in court must be dismissed for lack of standing (*Quevedo*, at pp. 1141–1142), which is the position embraced in *Viking River*.  As we note in our summary of *Viking River*, that is not the position the employer advocated; the high court appears to have adopted it as a middle ground.  Until that time, *Quevedo* was an outlier. The only published California decision to address the argument that PAGA actions may be split in the manner that *Quevedo* ordered holds to the contrary, as *Iskanian* notes.  (*Iskanian, supra*, 59 Cal.4th at pp. 383–384, citing *Reyes v. Macy's, Inc.* (2011) 202 Cal.App.4th 1119, 1123–1124.)

action—an individual piece and a non-individual piece.  In March 2014, we believe the reference to "individual action[s]" in the proviso likely was an effort to distinguish PAGA actions from non-PAGA individual actions for violation of the Labor Code.  (See *Kim*, *supra*, 9 Cal.5th at p. 81 ["the civil penalties a PAGA plaintiff may recover on the state's behalf are distinct from the statutory damages or penalties that may be available to employees suing for individual violations"].)[14]

The parties would have had to be clairvoyant to anticipate that, eight years later, the high court would introduce new terminology into the PAGA lexicon as a matter of federal law, giving the Paragraph 5 proviso clarity only in hindsight.  Although *Iskanian* was not yet on the books, perhaps an exceptionally astute attorney specializing in the law of arbitration might have foreseen that the *Stolt-Nielsen* and *AT&T Mobility* line of cases might one day put in jeopardy any holding from a California court that wholesale PAGA waivers are unenforceable on public policy grounds.  But even granting the possibility of such a prediction, when certiorari was eventually granted in *Viking River*—signaling that *Iskanian* might be overruled on preemption grounds, just as *Discover Bank* was years earlier—it was hardly predictable that the top court would take the path that it did.  California courts are just beginning to grapple with how the concept of an "individual PAGA claim" will fit into the PAGA statutory scheme.  *Adolph* was the first major decision in what will surely be an ongoing project.

---

[14] E.g., Labor Code sections 558, subdivision (a)(3) (damages for unpaid wages) and 1197.1 (liquidated damages for minimum wage violations); see *CRST Expedited, Inc. v. Superior Court*, *supra*, 112 Cal.App.5th at page 892, review granted (citing pre-*Viking River* decisions that "have used 'individual claims' to describe non-PAGA claims that an employee pursues in his or her own capacity to recover victim-specific relief").

To be sure, had *Viking River* been the law in March 2014, we might have agreed with Marshalls' proposed interpretation of Paragraph 5. But it wasn't. Certainly, as of May 2022, when *Viking River* came down, and henceforth from that point in time, the trial court's categorical statement that there is "no such thing as an 'individual PAGA claim' " in California law may have been stated too broadly. Although we now know that PAGA actions *can* be " 'divided into individual and non-individual claims' where the parties have agreed to arbitrate individual claims" (*Adolph*, *supra*, 14 Cal.5th at p. 1114), the fact that that is the case today tells us nothing about whether LaCour and Marshalls actually made such an agreement more than a decade ago. We agree with LaCour that they did not.

## IV. DISPOSITION

Affirmed. Costs on appeal shall be awarded to respondent.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

24

STREETER, J., Concurring

I concur in full, of course, but add some additional thoughts of my own. This case turns on garden-variety contract analysis focusing on the mutual intention of the parties in 2014. When we address arbitration agreements, " 'as with any other contract, the parties' intentions control.' " (*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.* (2010) 559 U.S. 662, 682 [130 S.Ct. 1758].) Our evaluation of contractual intent here turns on the evolution of the background law. While the trial court's statement that "there is no such thing as an 'individual PAGA claim' " was certainly correct as a description of how California law has long been understood and applied (see *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 86 (*Kim*) ["a PAGA claim is not simply a collection of individual claims for relief"]), unquestionably the legal ground has shifted.

The sharp turn things took in 2022 has been noted elsewhere. (See *CRST Expedited, Inc. v. Superior Court* (2025) 112 Cal.App.5th 872, 890 (*CRST*), review granted, Sept. 17, 2025, S292005 [*Viking River Cruises, Inc. v. Moriana* (2022) 596 U.S. 639 [142 S.Ct. 1906] (*Viking River*) "drastically alter[ed] the legal landscape"]; *Leeper v. Shipt, Inc.* (2024) 107 Cal.App.5th 1001, 1011 (*Leeper*), review granted, Apr. 16, 2025, S289305 ["it was only after *Viking River* . . . that courts began discussing the possibility of splitting PAGA claims into individual and representative components that might be adjudicated in separate fora"].) Without getting into the different views other courts have expressed about so-called "headless PAGA claims,"[1] I write separately to underscore just how much of a sea change *Viking River*

---

[1] Compare *CRST, supra*, 112 Cal.App.5th at pages 902–918, review granted, and *Rodriguez v. Packers Sanitation Services LTD., LLC* (2025) 109 Cal.App.5th 69, 74–81, review granted, May 14, 2025, S290182 with *Leeper, supra*, 107 Cal.App.5th at pp. 1008–1012, review granted.

1

was, and to identify certain issues that may need to be addressed—some by the high court itself—as we grapple with the fallout from it.

## I.

But for Justice Sotomayor's brief concurrence in *Viking River*, four members of the United States Supreme Court appear to have been prepared to order the dismissal of Angie Moriana's PAGA action without condition or qualification. (*Viking River, supra,* 596 U.S. at pp. 662–663.) The fact there was even a split vote on the proper disposition of her case is noteworthy in itself, since to resolve it as the plurality proposed in Part IV of the opinion would have run contrary to bedrock precedent under Article III of the United States Constitution.[2] Except in exceedingly narrow circumstances no one in *Viking River* suggested were present,[3] the high court has always treated state court decisions on state law issues as conclusive. It has also

---

[2] See *Murdock v. City of Memphis* (1874) 87 U.S. 590, 626 [22 L.Ed. 429] ("The State courts are the appropriate tribunals, as this court has repeatedly held, for the decision of questions arising under their local law, whether statutory or otherwise."); *Martin v. Hunter's Lessee* (1816) 14 U.S. 304 [4 L.Ed. 97] (United States Supreme Court has Article III power to revise the judgments of state courts on matters of federal law); see Henry M. Hart, Jr., *The Relations Between State and Federal Law* (1954) 54 Colum. L.Rev. 489, 503–504 (pairing *Murdock* with *Martin v. Hunter's Lessee* as "twin pillars" of federal-state relations). Perhaps the plurality of four Justices who joined *Viking River* without qualification were not actually prepared to overlook this fundamental limit on their power, but, if so, Part IV of their opinion constitutes an advisory opinion, which was also beyond their Article III power. (*Hayburn's Case* (1792) 2 U.S. 409 [1 L.Ed. 436].) It was one or the other.

[3] See *Moore v. Harper* (2023) 600 U.S. 1, 35 [143 S.Ct. 2065]; *Bush v. Gore* (2000) 531 U.S. 98, 111–122 [121 S.Ct. 525] (conc. opn. of Rehnquist, C. J.).

2

taken care to show respectful regard for the work of state judges, even when reversal of their judgments is warranted.[4]

The dismissive approach the high court took to California law in *Viking River* is a jarring departure from these long-established principles and norms. A running theme throughout the *Viking River* opinion is that because PAGA case law still is in an "embryonic" stage (an odd supposition given the more than 230 published PAGA opinions that have been filed in the nearly two decades since PAGA was enacted), California courts have developed an "entire vocabulary" and a "manner of speaking" that has the "unfortunate feature" of giving the term "representative" a double meaning. (*Viking River, supra*, 596 U.S. at pp. 648–649 & fn. 6.) Without providing any case law citations for this inaccurate premise,[5] the high court came up with its own terminology ("individual PAGA claim" and "non-individual

---

[4] The classic articulation of this point is from Justice Story in *Martin v. Hunter's Lessee*. His opinion in that watershed case readily acknowledged that state judges "are bound by an oath to support the constitution of the United States," and even while reversing the state court judgment under review there, was quick to "very cheerfully admit" that "the judges of the state courts are, and always will be, of as much learning, integrity, and wisdom, as those of the courts of the United States." (*Martin v. Hunter's Lessee, supra*, 14 U.S. at p. 346.)

[5] The word "representative" as used in the PAGA case law is not a judicial invention. It is a statutory term that our Legislature used 11 times in the PAGA scheme as part of the phrase "aggrieved employee or representative" (see Lab. Code, §§ 2699, subd. (s)(1), 2699.3, subds. (a)(1)(A), (a)(2)(A), (a)(2)(B), (b)(1), (c)(1)(A), (c)(1)(D), (c)(1)(E), (c)(2)(A), (c)(3)(A), (c)(3)(B)), in all instances descriptively referring to a PAGA plaintiff as someone who sues as a proxy—or representative—of the state. The notion that PAGA cases use the term "representative" in some "second sense" to describe a PAGA plaintiff's ability to recover penalties for Labor Code violations suffered by other employees appears to reflect nothing more than a failure to appreciate the breadth of statutory standing under PAGA.

PAGA claim") and superimposed it on the PAGA statute as a matter of federal law.

What we are left with is a strange hybrid consisting in part of the PAGA statute our Legislature enacted—as applied and construed by the California courts faithfully for nearly 25 years—as now supplemented with a federal gloss. Under Article VI of the United States Constitution, not only must the California courts accept and incorporate this gloss into the statutory scheme (which is something our Supreme Court began the process of doing in *Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104 (*Adolph*)) but the Legislature must abide by it as well. Normally, of course, if we in the California judiciary adopt an interpretation of a state statute that is out of accord with legislative intent, our elected representatives can rectify the error. Not so here. Given the supremacy of federal law, the Legislature could not, even if it wished to do so, reconfirm its intent is exactly what the California Supreme Court held in *Kim*: "There is no individual component to a PAGA action because ' "*every* PAGA action . . . is a representative action on behalf of the state." ' " (*Kim, supra,* 9 Cal.5th at p. 87, original italics.)

## II.

Other California Court of Appeal justices have pointed out the *Viking River* court's inattention to PAGA's statutory text and unusual "rhetorical techniques."[6] My focus is on something else. The high court did more than

---

[6] See *CRST, supra,* 112 Cal.App.5th at page 890, footnote 4, review granted ("Despite its importance, the United States Supreme Court did not include the term 'civil penalty' in its definition of ' "individual PAGA claim," ' which it stated referred 'to claims based on code violations suffered by the plaintiff.' [Citation.] This truncated definition and other rhetorical techniques of the court tended to emphasize the plaintiff's personal role in

simply preempt the "secondary rule" in *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348 (*Iskanian*) against separate arbitration of "individual PAGA claims for Labor Code violations" on the ground it conflicts with federal policy under the FAA.  In order to *find* a conflict with pro-arbitration FAA policy, and thus a basis to invoke federal preemption, the high court made a choice of law move that is not only easy to miss, but that is bound to present considerable difficulty for California courts as we strive to integrate the new concept of "individual PAGA claims" into California law.

Let me be more specific.  The high court reasoned that, by permitting PAGA plaintiffs to recover penalties for Labor Code violations suffered by others, the PAGA scheme effectively allows "freeform joinder" of a "massive number of claims in a single package suit." (*Viking River*, *supra*, 596 U.S. at p. 661.)  This feature of PAGA, the high court held, gives a PAGA plaintiff the ability to agree to arbitrate a PAGA dispute and then, after the fact, "superadd new claims," thus expanding the arbitration beyond anything that might be considered a single "claim." (*Viking River,* at pp. 660–661.)  But the word "claim" is not mentioned in the PAGA statute, and though the high court referenced an "ordinary legal meaning" (*Viking River*, at p. 653), what it quite clearly had in mind was an ordinary meaning in *federal* procedural law.

Citing *Carpenter v. Shaw* (1930) 280 U.S. 363 [50 S.Ct. 121] (*Carpenter*) in a footnote, the high court brushed aside California law on the ground that "labels" used by California courts may be ignored where conflict

---

the litigation and minimize the role and interests of the [Labor and Workforce Development Agency] as the plaintiff's principal and the owner of the claims.").

preemption requires it.[7] (*Viking River*, *supra*, 596 U.S. at p. 654, fn. 6.) The high court then went on to refer to a "claim" as a dispute bounded by "a particular ' " 'transaction' " ' or ' "common nucleus of operative facts." ' " (*Id.* at p. 661.) As support for this concept of a "claim," the high court cited *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.* (2020) 590 U.S. 405 [140 S.Ct. 1589] (*Viking River*, at p. 661), which in turn, at page 412, relied on the Restatement Second of Judgments, section 24, comment b, page 199 (Restatement Second), and a series of earlier high court cases (*Taylor v. Sturgell* (2008) 553 U.S. 880, 888 [128 S.Ct. 2161]; *U.S. v. Tohono O'odham Nation* (2011) 563 U.S. 307, 316 [131 S.Ct. 1723]; *Brown v. Felsen* (1979) 442 U.S. 127 [99 S.Ct. 2205]), all of which apply federal procedural law, as *Lucky Brand* does, in accordance with the Restatement Second.

To say, as the lead opinion does, that *Viking River*'s creation of the new federally mandated concept of an "individual PAGA claim" could not have been anticipated in 2014 is an understatement. The difference between a "claim" (in federal law) and a "cause of action" (in California law) is not just a matter of semantics. " '[W]hile federal law defines a "claim" for purposes of claim preclusion using a transactional test [citation], California law uses the older pleading term "cause of action" and defines it according to the common law doctrine of primary rights.' " (*LaCour v. Marshalls of California, LLC* (2023) 94 Cal.App.5th 1172, 1190; see *Guerrero v.*

---

[7] *Carpenter* is a case in which the high court rejected the State of Oklahoma's attempt to evade a federal property tax exemption on tribal land allotments by classifying royalties generated from wells located on tribal land as "personalty" and, on that basis, claiming the royalties had been severed from the land. (*Carpenter, supra,* 280 U.S. at pp. 365–369.) Plainly, the high court felt there was artifice involved.

*Department of Corrections & Rehabilitation* (2018) 28 Cal.App.5th 1091, 1099–1101 (*Guerrero*).)[8]

It was only by use of the Restatement Second's transactional "claim" definition that the *Viking River* court was able to characterize a PAGA claimant's ability to recover statutory penalties suffered by other employees as a mechanism allowing multiple "claims" to be bundled together. That makes sense if PAGA is viewed through a federal law prism. But looking at the PAGA scheme with California's "background legal rules" in mind (*Hohenshelt v. Superior Court* (2025) 18 Cal.5th 310, 335), it does not. If the premise that employers and employees may wish to bargain over the arbitrability of discrete "individual PAGA claims" is simply false—because California law does not recognize such "claims"—the conflict with federal law posited by the high court does not exist.

Stated differently, *Viking River* assumes its conclusion by choosing federal law in the first instance. If we start and end with state law, on the other hand, there is no conflict. Once a PAGA claimant establishes standing to sue—which turns on personal aggrievement—the form of available *relief* in a PAGA action may and usually does include penalties for violations suffered by others. As the California Supreme Court has explained, "civil penalties recovered on the state's behalf are intended to remediate present violations and deter future ones, not to redress employees' injuries." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986.) This is why, prior to the high

---

[8] The California Supreme Court has confined the doctrine of primary rights to a " 'fairly narrow field of application' " (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 395) and has acknowledged longstanding criticism of its sometimes uncertain scope (*id.* at p. 395; see 4 Witkin, Cal. Procedure (6th ed. 2025) Pleading, § 38), but the doctrine remains a lodestar principle of California procedural law.

7

court's recent intervention, there was no debate in our case law about whether the statutory term "representative" is ambiguous. Sure, a PAGA plaintiff stands to recover a share of the *total* recovered penalties as the state's representative, but that is in the nature of a qui tam action. Under the PAGA statute as enacted, an employer's potentially large exposure in some actions (depending on the size of its enterprise) results from a form of statutory relief designed as a deterrent to incentivize strict compliance with wage and hour laws. But it is not and was never designed to be some kind of manipulable right of joinder, allowing "massive" bundling of "claims." (*Viking River*, *supra*, 596 U.S. at p. 661.)

The *Viking River* court's procedural reconceptualization of PAGA under federal law is an odd fit with the actual structure of the statute. Under the PAGA scheme, at least as it was understood by California courts prior to *Viking River* based on our own procedural law, "[t]he primary right" at issue—the state's right to insist on compliance with its wage and hour laws, which corresponds reciprocally with the defendant employer's duty to comply with those laws—"must . . . be distinguished from the *remedy* sought: 'The violation of one primary right constitutes a single cause of action, though it may entitle the injured party to many forms of relief, and the relief is not to be confounded with the cause of action, one not being determinative of the other.' " (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 682 (*Crowley*) (original italics); *Wulfjen v. Dolton* (1944) 24 Cal.2d 891, 895–896.) Nor does each of what may be many alleged Labor Code violations in a single PAGA cause of action constitute a separate "claim." Under a transactionally bounded approach to "claim" definition, they might. But that simply confirms why the choice of background procedural law is so consequential in the analysis.

8

"The most salient characteristic of a primary right is that it is indivisible:  the violation of a single primary right gives rise to but a single cause of action."  (*Crowley, supra*, 8 Cal.4th at p. 681.)  Thus, what the *Viking River* court called the secondary rule enunciated in *Iskanian* is actually nothing more than a straightforward application of the indivisibility of a cause of action under long established principles of res judicata in California.  This specific feature of the primary rights doctrine, as applied in *Iskanian*, is what *Viking River* found to be preempted.  But now that *Iskanian*'s indivisibility holding has been invalidated, the question arises:  How much, if any, of the primary rights doctrine remains applicable in California when we are dealing with PAGA cases?  That is not an easy question under the new federal-state hybrid version of PAGA bequeathed to us in *Viking River*.  The answer is anything but clear, and it raises a host of further questions about *Viking River* itself.

### III.

So far as I can discern, the only effort the *Viking River* court made to anchor its "individual PAGA claim" and "non-individual PAGA claim" definitions in federal law is the citation in footnote 6 of its opinion to *Carpenter, supra,* 280 U.S. 363.  Obviously, conflict preemption authorizes— indeed requires as a constitutional matter—that any state law found to collide with a federal policy delineated by Congress must give way.  But that is a power to negate, not a power to create.  And in any event, *Carpenter* predates Justice Brandeis's groundbreaking opinion in *Erie R. Co. v. Tompkins* (1938) 304 U.S. 64 [58 S.Ct. 817], which fundamentally and profoundly changed the way federal courts view their authority to displace state law with federal law.  In the days of Chief Justice Taney, federal courts sometimes felt free to "ignore[] state decisional law" on matters of

9

common law (Collins et al., *Judicial Federalism Under Marshall and Taney* (2017) 2017 Sup. Ct. Rev. 337, 363), but *Erie* put an end to all that.

After *Erie*, the high court adopted stringent criteria limiting federal common lawmaking power to some discrete "enclaves" that are frequently described as "few and restricted." (*Wheeldin v. Wheeler* (1963) 373 U.S. 647, 651 [83 S.Ct. 1441].) Illustrative of these cases are *Clearfield Trust Co. v. United States* (1943) 318 U.S. 363, 367 [63 S.Ct. 573] (*Clearfield*), *Textile Workers Union of America v. Lincoln Mills of Alabama* (1957) 353 U.S. 448, 456–457 [77 S.Ct. 912] (*Lincoln Mills*), *Wallis v. Pan American Petroleum Corp.* (1966) 384 U.S. 63, 67–69 [86 S.Ct. 1301] (*Wallis*), *United States v. Kimbell Foods, Inc.* (1979) 440 U.S. 715 [99 S.Ct. 1448] (*Kimbell Foods*), and *Boyle v. United Technologies Corp.* (1988) 487 U.S. 500 [108 S.Ct. 2510].[9]

How *Viking River* squares with the *Clearfield* line of cases is anyone's guess. This body of law has been so stable for so long that it may be easy to lose sight of first principles: Although Congressional power is recognized to be limited by enumerated powers (*United States v. Lopez* (1995) 514 U.S. 549, 552 [115 S.Ct. 1624]), "the Constitution bears not only on congressional power but also imposes a distinctive, independently significant limit on the authority of the federal courts to displace state law." (Paul J. Mishkin, *Some Further Last Words on Erie - The Thread* (1974) 87 Harv. L.Rev. 1682, 1682.) In recognition of that fundamental limitation, the *Clearfield* line of

---

[9] Cf. *Collins v. Virginia* (2018) 584 U.S. 586, 608 [138 S.Ct. 163], concurring opinion of Thomas, J. ("To the extent these enclaves are not rooted in the Constitution or a statute, their pre-emptive force is questionable. But that is why this Court has 'limited' them to a ' "few" ' 'narrow areas' where 'the authority and duties of the United States as sovereign are intimately involved' or where 'the interstate or international nature of the controversy makes it inappropriate for state law to control.' ").

cases places what is, in effect, a hydraulic brake on federal common lawmaking.

Under the "enclaves" approach laid down in these cases, there is a two-step test that *begins* with identification of a "significant conflict between some federal policy or interest and the use of state law." (*Wallis, supra*, 384 U.S. at p. 68.)  Because "[e]ven where there is . . . federal legislation in an area, . . . it must be remembered that 'Congress acts . . . against the background of the total *corpus juris* of the states' " (*ibid.*), and thus federal common law is often called "interstitial" in nature.  (*United States v. Little Lake Misere Land Co., Inc.* (1973) 412 U.S. 580, 593 [93 S.Ct. 2389].)  As a result, a "significant conflict" between federal and state law is insufficient by itself to justify federal judicial lawmaking.

If there is such a conflict, the federal courts have *power* to craft federal common law, but there is a second, *discretionary* step at which a choice must be made whether to adopt—or " 'borrow[]' "—state law, rather than displace it with judicially crafted federal law.  (*United States v. Little Lake Misere Land Co., supra*, 412 U.S. at p. 594; see *Clearfield, supra*, 318 U.S. at p. 367; *United States* v. *Standard Oil Co.* (1947) 332 U.S. 301, 308–309 [67 S.Ct. 1604].)  At the second step, a balance is struck between the need for national uniformity and the disruptive effect of creating a federal law rule on established legal relationships formed in reliance on state law.  (*Kimbell Foods, supra*, 440 U.S. at pp. 727–729.)

Our case—involving a contract entered in 2014 with the expectation that state procedural law would govern—is but one of what are no doubt millions of instances exemplifying the reliance interest of employers and employees governed until 2022 by settled California PAGA law, which has now been thrown into a state of uncertainty.  As guardians of state law, we

11

in the California judiciary are dutybound to consider this kind of disruption. One would have thought that, had the high court noted the weighty set of issues behind its creation of a new federally mandated rule for PAGA, and dealt fully and openly with the consequences for California law of doing so, the choice step of this analysis would have favored state law, since, just as there is "no federal law of domestic relations, which is primarily a matter of state concern" (*De Sylva v. Ballentine* (1956) 351 U.S. 570, 580 [76 S.Ct. 974]), there is also no such thing as a federal common law of procedure that binds state courts. (See Amy Coney Barrett, *Procedural Common Law* (2008) 94 Va. L.Rev. 813, 823 & fn. 22, 831.)[10]

Instead, what we have in *Viking River* is freedom of contract run amok, for it overrides structural features of the United States Constitution that protect the freedom of the citizens of every state to have the law governing their everyday lives made through elected representatives at the state level (federalism), while prohibiting unelected and unaccountable federal judges from stepping in for Congress to enunciate superseding national law by their own lights (separation of powers). *Lamps Plus, Inc. v. Varela* (2019) 587 U.S. 176 [139 S.Ct 1407]—which is cited prominently in *Viking River* (*Viking River*, *supra*, 596 U.S. at pp. 650–651, 659–661)— appears to presage this foray into unrestrained federal common lawmaking (see *Lamps Plus*, at pp. 204–205 (dis. opn. of Sotomayor, J.)). *Viking River* goes much further; its casual invasion of state sovereignty is breathtaking,

---

[10] Although there are some exceptions (see, e.g., *Williams v. Reed* (2025) 604 U.S. 168, 170 [145 S.Ct. 465] [state law exhaustion rule that entirely blocked assertion of federally authorized right of recovery under 42 U.S.C. § 1983 is preempted]), " '[t]he general rule, "bottomed deeply in [a] belief in the importance of state control of state judicial procedure, is that federal law takes the state courts as it finds them" ' " (*Johnson v. Fankell* (1997) 520 U.S. 911, 919 [117 S.Ct. 1800]).

and it does this in a breezy way, without explanation.  As Justice Frankfurter once said, however, "[t]hese problems are not rendered non-existent by disregard of them."  (*Lincoln Mills, supra*, 353 U.S. at p. 462 (dis. opn. of Frankfurter, J.).)

Even assuming the high court had Article III power to create a heretofore unrecognized rule of federal procedural common law that is binding on the California courts, and even assuming the discretionary calculus that is required as a prerequisite to federal common lawmaking allowed the high court to create an "individual PAGA claim," displacing state law to the contrary and replacing it with judge-made federal law, there remains the boundary set by the Tenth Amendment.  (See Anthony J. Bellia, Jr., *Federal Regulation of State Court Procedures* (2001) 110 Yale L.J. 947, 952 [arguing that every state has "sovereign authority to regulate the procedures by which its courts enforce the rights that it creates"]; Barrett, *Procedural Common Law, supra*, 94 Va. L.Rev. at p. 833, fn. 58 [acknowledging that if Professor Bellia "is correct, the Tenth Amendment would not only limit the ability of Congress to regulate state judicial procedure, but it would also limit the ability of federal courts to regulate state judicial procedure"].)

Our state rules of res judicata, of course, reflect underlying commitments we have in the California courts to finality and avoidance of piecemeal litigation.  (See *Guerrero, supra*, 28 Cal.App.5th at p. 1099.) About these quintessentially state-level concerns for how proceedings are to be conducted in our own courts, all the high court had to say in *Viking River* is that "bifurcated proceedings" are an "inevitable result" of the need to accommodate arbitral freedom of contract.  (*Viking River, supra*, 596 U.S. at p. 660.)  That is a nice policy point, and California appellate judges would

13

normally evaluate it as they would any other pitch for an exception to the rules of res judicata, but as a directive from the high court it raises a foundational Tenth Amendment question.  Conflict preemption does not provide an answer to this antecedent question about the reach of federal power, whether we take the holding in *Viking River* as something dictated by a Congressionally delineated policy under the FAA or a rule of procedure devised by the high court itself.

## IV.

These are just some of the issues the uncertain provenance of the new federally mandated concept of an "individual PAGA claim" raises.

Sixty-five years ago, David Currie coined the phrase, "The Devil's Own Mess"—taken from Ibsen—in the title of a well-known article commenting on a jumble of conflicting high court cases dating back to the *Lochner*[11] era in what eventually became one of the recognized "enclaves" of federal common law (admiralty).  (See David P. Currie, *Federalism and the Admiralty: "The Devil's Own Mess"* (1960) 1960 Sup. Ct. Rev. 158.)  Just as *Viking River*'s enunciation of a federal law procedural rule binding on the California courts is ultimately rooted in pre-*Erie* authority, Currie traced this line of precedent to a seminal case from 1917,[12] a time when the high

---

[11] *Lochner v. New York* (1905) 198 U.S. 45 [25 S.Ct. 539], overruled by *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379 [57 S.Ct. 578].

[12] *Southern Pacific Co. v. Jensen* (1917) 244 U.S. 205 [37 S.Ct. 524], superseded by statute as stated in *Director, OWCP v. Perini North River Associates* (1983) 459 U.S. 297, 306 [103 S.Ct. 634].  The Currie article discussed a myriad of difficulties presented by what was once known as the " '*Jensen* line,' " a line of demarcation between federal and state law in state workers' compensation cases that arose out of incidents on navigable waterways.  (*Perini*, at p. 306, fn. 14.)  *Jensen* is the case that prompted the famous statement from Justice Holmes, in dissent, anticipating *Erie*, that

court routinely engaged in what he called the "ruthless destruction of state interests, wherever the need for uniformity [was] recognized." (*Id.* at p. 161.) With all respect, the title of that article, and the attitude described in it, aptly describe *Viking River* today.

But where does all of this leave us? I would sort things out in the following way, guided by two principles. First, our Supreme Court has instructed that, following its lead, "[f]or consistency," we must all "use the terms 'individual' and 'non-individual' claims in accordance with the high court's usage in *Viking River*" (*Adolph, supra,* 14 Cal.5th at p. 1114), and that *"[w]here a plaintiff has brought a PAGA action comprising individual and non-individual claims,* an order compelling arbitration of the individual claims does not strip the plaintiff of standing as an aggrieved employee to litigate claims on behalf of other employees under PAGA" (*ibid.,* italics added). Second, we should not, in my view, assume that every PAGA cause of action inherently comprises an "individual PAGA claim" and a "non-individual PAGA claim." The high court misunderstood as a matter of state law that that is the case, just as it misunderstood statutory standing under PAGA.

The primary rights theory is a rule of pleading, and the plaintiff is "the master of its own pleadings." (*Starview Property, LLC v. Lee* (2019) 41 Cal.App.5th 203, 212.) In my view, only when a PAGA plaintiff *affirmatively pleads* that a PAGA cause of action comprises separate "individual" and "non-individual" components does the federal claim splitting rule enunciated in *Viking River* kick in, along with its special terminology. Any interpretation of *Viking River* that requires us to read the

_____

"[t]he common law is not a brooding omnipresence in the sky." (*Jensen*, at p. 222 (dis. opn. of Holmes, J.).)

15

federal, nonstatutory concept of "individual PAGA claims" and "non-individual PAGA claims" into every PAGA cause of action raises serious constitutional questions that are best avoided by a narrower interpretation of the holding in that case.

Trial Court:        Superior Court of California, County of Alameda

Trial Judge:        Hon. Noël Wise

Counsel:            Littler Mendelson, Bradley E. Schwan, Janine Kranz,
                        Brittany L. McCarthy and Amelia A. McDermott for
                        Defendants and Appellants.

                    Setareh Law Group, Shaun Setareh and Thomas Segal for
                        Plaintiff and Respondent.